# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### COLUMBIA DIVISION

| | | |
|---|---|---|
| CALVIN ANTHONY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:05-1636-MBS-BM |
| | ) | |
| v. | ) | |
| | ) | |
| SOUTH CAROLINA | ) | **REPORT AND RECOMMENDATION** |
| DEPARTMENT OF | ) | |
| CORRECTIONS, ROBERT WARD, | ) | |
| AND CHARLES SHEPPARD, in | ) | |
| their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et.</u> seq.; 42 U.S.C. § 1983;[1] and the "Common Law of the State of South Carolina", alleging employment discrimination based on his race (African-American). At the conclusion of pretrial discovery, the Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on April 28, 2006. After receiving an extension of time, Plaintiff filed a memorandum in opposition to the Defendants' motion on June 16, 2006, following which Defendants filed a reply memorandum on June 26, 2006. Mediation was attempted on August 23,

---

[1]Although Plaintiff cites to § 1983 in ¶ 4 of his Complaint, none of his three causes of action assert a § 1983 claim. Plaintiff's first two causes of action are against the Defendant Department of Corrections under Title VII, while his third cause of action for civil conspiracy is asserted as a "pendent state claim".



2006, which was unsuccessful.  Defendants' motion is now before the Court for disposition.[2]

### Background and Evidence[3]

Plaintiff is a former Warden of the Lee Correctional Institution (LCI), a prison in the Defendant South Carolina Department of Corrections' (SCDC) prison system.  Plaintiff had worked for the Department for twenty-four (24) years when, in 2002, he began to be supervised by the Defendant Ward (white), Deputy Director of the Department.  Plaintiff's Deposition (Day 1), pp. 9-10; Ward Deposition, pp. 6-7.  Plaintiff was the Warden at LCI at that time.  LCI is a "Level Three" prison, one of three such facilities in the prison system, and as such houses the most violent inmates in the prison system, with the toughest security.  Plaintiff's Deposition (Day 1), pp. 108-109; Ward Deposition, pp. 40, 229-231; Bessinger Deposition, p. 42.  At the time Ward became Deputy Director, and Plaintiff's supervisor, all three Level Three prisons had African-American wardens.  Bessinger Deposition, p. 53.

During his many years with the Department, Plaintiff had routinely received good evaluations from his supervisors.  Plaintiff's Deposition (Day 2), pp. 9, 19; Ward Deposition, pp. 28, 32.  After Ward became Plaintiff's supervisor, he did not receive any annual evaluations (which were required by State law), but he was voted Warden of the Year in 2002, and also received a commendation for his role in handling a disturbance with hostages in October 2003.  Plaintiff's

---

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C.  The Defendants have filed a motion for summary judgment.  As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[3]The facts and evidence are considered and discussed hereinabove in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).



Deposition (Day 2), pp. 30, 44; <u>Ward Deposition</u>, p. 27; <u>Bessinger Deposition</u>, pp. 15, 21, 44.

        When fellow African-American Rickie Harrison was removed as Warden at the Kershaw Correctional Institution (KCI), Plaintiff was sent in by Ward for a short time to serve as Interim Warden for a few weeks.  <u>Plaintiff's Deposition (Day 2)</u>, pp. 10-11; <u>Ward Deposition</u>, pp. 7-8.  Harrison pursued a grievance, for which Plaintiff was listed as a witness for the Department. He was not called, however, and in fact believed that Harrison had possibly been the victim of race discrimination.  Plaintiff discussed this belief with several people, including both Ward and the Defendant Sheppard (white), Inspector General for the Department.  <u>Plaintiff's Deposition (Day 1)</u>, pp. 83-84, 138-139.

        Plaintiff also had a personal belief that both Sheppard and Ward were biased in favor of white wardens.  <u>See generally</u>, <u>Plaintiff's Deposition (Day 1)</u>, pp. 56-57, 65, 69, 74.   Plaintiff testified that Ward would visit LCI less frequently than previous supervisors had visited, and instead visited institutions where there were white wardens.  Ward also would not allow Plaintiff to serve on the Institution's Management Team.  <u>Plaintiff's Deposition (Day 1)</u>, pp. 44, 51-53.  Plaintiff further testified that, following an October 2003 major disturbance at LCI, Ward asked him to put some negative things in the after-incident report concerning the conduct of Laurie Bessinger, the Director of Security.  Plaintiff testified that when he refused because he did not believe Ward's criticisms were justified, Ward became upset with him for not doing as he was asked.  <u>Plaintiff's Deposition (Day 1)</u>, pp. 76-78; <u>Plaintiff's Deposition (Day 2)</u>, p. 30.   Bessinger confirmed in his deposition that Plaintiff had told him about Ward's request.  <u>Bessinger Deposition</u>, pp. 6-8. Associate Warden Henry Pridgen was also asked by Ward to include negative comments about Bessinger in his report, but he also refused.  <u>Bessinger Deposition</u>, p. 9; <u>Pridgen Deposition</u>, pp. 31-

3



32.

In January 2004, Karen Hair (white), an investigator under the supervision of Inspector General Sheppard, sent an email to Sheppard expressing concerns about the boiler room at LCI, in particular rumors that Maintenance Supervisor James Goff was giving inmates access to the pantry in the cafeteria and allowing inmates to consume marijuana while working in the boiler room.  Hair Affidavit, ¶¶ 1 and 2, and Attachment A.  Goff was responsible for the boiler room, and he was supervised by Maintenance Supervisor Tom Morrow.  Morrow was supervised by Pridgen, Associate Warden for Operations, who in turn reported to the Plaintiff as Warden of the Institution. Sheppard ordered that an Institution-wide "shakedown" be undertaken, which took place on January 29, 2004.  Plaintiff's Deposition (Day 1), pp. 24-28.  Ward was advised that this shakedown would take place, but Plaintiff was not;  Plaintiff's Deposition (Day 1), p. 24; Ward Deposition, pp. 58-59; even though Plaintiff, Bessinger (who had previously been the Warden at the Kirkland Correctional Institution (KCI)), and Pridgen all testified that it was routine practice to notify the Warden of an Institution in advance that a shakedown was going to occur, because a lot of planning and personnel adjustments were required.  Plaintiff's Deposition (Day 1), pp. 24-28; Bessinger Deposition, pp. 41, 48; Pridgen Deposition, p. 63.  Other than with regard to the Plaintiff in January 2004, the only warden who had previously had an unannounced inspection was Warden Harrison (also an African-American).  See also Ward Deposition, pp. 57-60.

Ward testified that Plaintiff was not advised of the shakedown because there was a suspicion that Associate Warden Pridgen may have been involved in some type of wrongdoing, and that because of the close relationship between Pridgen and the Plaintiff he was concerned that "somehow that word would get back to the individual in the boiler room....".  Ward conceded,



however, that he could not recall Plaintiff ever betraying his trust by communicating information to Pridgen before. Ward Deposition, pp. 74-77.

The shakedown at LCI found unsupervised inmates in the boiler room in possession of keys to secured areas, as well as a large volume of contraband, including computer equipment and food items from the cafeteria. Sheppard Affidavit, ¶¶ 3, 7; Hair Affidavit, ¶¶ 3 and 4 and Attachment B. No drugs or weapons were found in the boiler room, although a number of weapons as well as some drugs and alcohol were found in the residential part of the prison. This was not an unusual occurrence in the prison setting. Ward Deposition, pp. 70-73. An investigation concerning the findings from the boiler room was conducted by Hair, fellow Investigator Richard Steen, and agents from the South Carolina Law Enforcement Division (SLED). Following the investigation, SLED filed no charges of criminal wrongdoing. Ward Deposition, pp. 120-121.

However, Goff was put on leave immediately, and subsequently terminated through action initiated by Ward, excluding the Plaintiff from the process. Ward Deposition, pp. 123-124. Goff's termination was later withdrawn, and he was allowed to resign. Goff Affidavit. Morrow also apparently lost his job based on his failure to control Goff.[4] Major John Brooks, who had signed off on inmates clearing key ways on locks (one of the charges), gave statements to investigators implicating Pridgen in wrongdoing. Investigative Report, Bates No. 1996-1997; Ward Deposition, Exhibit 12. Brooks received no punishment and was later promoted; Plaintiff's Deposition (Day 2), pp. 51-52; Ward Deposition, p. 175; but Pridgen later lost his job. Sheppard Affidavit, Attachment C1 and C2; Ward Deposition, p. 175. Pridgen testified that, on an earlier occasion when

---

[4]Plaintiff makes this assertion in his brief, and the Defendants have not disputed this issue. However, the evidentiary cites for this purported fact do not reference Morrow being terminated. See Plaintiff's Deposition (Day 1), Exhibit 6; Ward Deposition, Exhibit 12.



he had questioned the fairness of Karen Hair, Sheppard had told him that he would "personally find a way to fire him", or words to that effect. Pridgen Deposition, p. 60.

On July 16, 2003 a memorandum had been issued to all eligible employees with the Department (which included the Plaintiff) regarding retirement opportunities under a new program. See Plaintiff's Deposition (Day 1); Defendants' Exhibit 12 (Attachment).  This program allowed employees to retire, and to then be rehired.  Plaintiff testified that both Ward and SCDC Director Jon Ozmint encouraged him to retire, and then be rehired under this program, which was known as the Teri Program. Plaintiff's Deposition (Day 1), pp. 88-89.[5]  In fact, many Department employees were being encouraged to take advantage of this opportunity.  Plaintiff's Deposition (Day 1), pp. 89, 177-178.  Plaintiff signed a document indicating his wish to participate in the Teri Program on April 30, 2004, which was effective June 30, 2004.  See Plaintiff's Deposition (Day 1); Defendants' Exhibit 12( Attachment); see also Ward Deposition, pp. 130-132.

After Plaintiff had signed up for the Teri Program, Plaintiff was charged on June 16, 2004 with violations of gross negligence and falsification of official documents arising out of the January 2004 shakedown at LCI. Near Affidavit, ¶ 4 and Attachment B.  Prior to that time, Plaintiff had not been aware that he was being investigated for any wrongdoing, or that the Defendant was not going to rehire him after he retired under the Teri Program.  Plaintiff was not in fact rehired after his effective retirement date.  Near Affidavit, ¶ 4 and Attachment B; see Ward Deposition, pp. 215-216; Plaintiff's Deposition (Day 2), pp. 59-62.  Plaintiff testified that Ward told him that if he did not go through with his retirement, even though he was not going to be rehired as was originally

---

[5]Plaintiff testified that, under this Program, he would receive his retirement, and would also receive 75% of his salary as Warden after being reinstated to his old position.  Plaintiff's Deposition (Day 1), pp. 90-91.



planned, that he would be terminated.  <u>Plaintiff's Deposition (Day 1)</u>, p. 126; <u>Plaintiff's Deposition (Day 2)</u>, p. 17; <u>see</u> <u>also</u> <u>Ward Deposition</u>, pp. 175-176.

Plaintiff then filed a charge of discrimination with the South Carolina Human Affairs Commission (SCHAC) on August 30, 2004, in which he alleged that he had been discriminated against on the basis of his race.  <u>Plaintiff's Deposition (Day 1), Defendants' Exhibit 2</u>.   After receiving a right to sue letter, Plaintiff filed this action in United States District Court.

**<u>Discussion</u>**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

**I.**

**(Race Discrimination Claim)**

Plaintiff alleges in his first cause of action that he was unfairly investigated and then terminated by the Defendant Department of Corrections on the basis of his race, in violation of Title VII. In order to pursue a disparate treatment claim for race discrimination under Title VII, Plaintiff must present evidence of intentional discrimination, either by direct evidence or by the structured procedures set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>see</u> <u>also</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981).

7

Plaintiff has not offered any direct evidence of race discrimination in his discharge.[6] However, the absence of direct evidence of discrimination is not fatal to Plaintiff's claim, as direct proof of discrimination rarely exists in this type of case.  In such a situation, indirect evidence of discrimination may be presented through the <u>McDonnell Douglas</u> framework.[7]

The United States Supreme Court articulated a three-part analysis for evaluating discrimination cases in <u>McDonnell Douglas</u>.  <u>First</u>, Plaintiff must establish a prima facie case of discrimination.  Once a prima facie case has been established, a rebuttable presumption is created that the employer unlawfully discriminated against the Plaintiff.  <u>Second</u>, once this presumption has been established, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for its actions. <u>Third</u>, if the employer shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiff to come forward with evidence that the employer's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the employer were really based on Plaintiff's race.  <u>McDonnell Douglas Corp.</u>,

---

[6]Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 56 F.3d 542, 548-549 (4th Cir. 1995), <u>rev'd on other grounds</u>, 517 U.S. 308 (1996); <u>Black's Law Dictionary</u>, 460 (6th Ed. 1990) (citing <u>State v. McClure</u>, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974); <u>see</u> <u>Williams v. General Motors Corp.</u>, 656 F.2d 120, 130 (5th Cir. 1981), <u>cert. denied</u>, 455 U.S. 943 (1982).

[7]In addition to a <u>McDonnell Douglas</u> analysis, consideration of Plaintiff's claim under the so-called "mixed-motive" analysis is also now allowed, even though Plaintiff has presented only circumstantial, or indirect, evidence of discrimination. <u>Hill v. Lockheed Martin Logistics Mgt., Inc.</u>, 354 F.3d 277, 284-285 (4th Cir. 2004); <u>see also</u> <u>Mereish v. Walker</u>, 359 F.3d 330, 339-340 (4th Cir. 2004); <u>Machinchick v. PB Power, Inc.</u>, 398 F.3d 345, 352 (5th Cir. 2005) [ADEA]. Previously, consideration of a claim under the mixed motive analysis was only proper in direct evidence cases. However, neither party has argued for consideration of Plaintiff's claim under a "mixed-motive" analysis. <u>See</u> <u>Hopes v. Roche</u>, No. 04-2963, 2005 WL 1812820 at * 6 n. 2 (D.Md. Aug. 2, 2005) (citing <u>Nagy v. Baltimore Life Ins. Co.</u>, 49 F.Supp.2d 822, 836 n. 13 (D.Md. 1999) [declining to engage in "mixed-motive" analysis where parties have not argued a mixed-motive theory.]).



411 U.S. at 802-805; <u>Texas Dep't of Community Affairs</u>, 450 U.S. at 252-256; <u>Conkwright v.</u>

<u>Westinghouse Elec. Corp.</u>, 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens

of production, however, Plaintiff retains the ultimate burden of persuasion on the issue of

discrimination throughout. <u>Texas Dep't of Community Affairs</u>, 450 U.S. at 252-253; <u>see also</u> <u>St.</u>

<u>Mary's Honor Ctr.</u>, 509 U.S. at 507.

       To establish his prima facie case of discrimination, Plaintiff would normally need to

show the following: (1) that he is a member of a protected class; (2) that he was qualified for his

position; (3) that he was fired in spite of his qualifications and adequate performance of his duties;

and (4) that similarly situated employees outside of his protected class received more favorable

treatment, or that he was otherwise discharged under circumstances giving rise to an inference of

unlawful discrimination. <u>See</u> <u>Settle v. Baltimore County</u>, 34 F.Supp.2d 969, 991 (D.Md. 1999), <u>aff'd</u>

<u>sub nom.</u>, <u>Harris v. Earp</u>, 203 F.3d 822 (table) (4th Cir. 2000); <u>see generally</u>, <u>Causey v. Balog</u>, 162

F.3d 795, 802 (4th Cir. 1998); <u>Brinkley v. Harbour Rec. Club</u>, 180 F.3d 598, 607 (4th Cir. 1999);

<u>St. Mary's Honor Ctr.</u>, 509 U.S. at 506. The Defendant, however, has only used a two prong prima

facie case for analysis of Plaintiff's claim: 1) that the Plaintiff engaged in prohibited conduct similar

to that of a person of another race, and 2) that disciplinary measures enforced against the Plaintiff

were more severe than those enforced against other persons, citing to <u>Moore v. City of Charlotte</u>,

754 F.2d 1100, 1105-1106 (4th Cir. 1985), <u>cert.</u> <u>denied</u>, 472 U.S. 1021 (1985).[8] These issues are

typically addressed under the fourth prong of the standard prima facie case. Therefore, for purposes

of summary judgment, Defendant essentially does not contest the first three prongs of the standard

---

    [8]The exact standard to be used in establishing a prima facie case is flexible depending on the factual situation and the claim alleged. <u>Ennis v. National Ass'n of Business and Educational Radio, Inc.</u>, 53 F.3d 55, 58(4th Cir. 1995).



prima facie case, but instead focuses its arguments on the fourth prong.

Defendant notes that Plaintiff does not dispute that an investigation did in fact conclude that security lapses and other violations occurred at LCI, and that the Plaintiff, as Warden, was the official ultimately responsible for the conditions at LCI.  While Plaintiff does dispute some of the findings of the investigation, such as that he had falsified documents; see Plaintiff's Deposition (Day 2), pp. 38-39, 65-66; Plaintiff's Deposition (Day 1), pp. 37-38; Goff Affidavit; Ward Deposition, Exhibit 8; Ward Deposition, pp. 12-14 163-165; Pridgen Deposition, p. 92; Bessinger Deposition, pp. 45-46; Burton Deposition, p. 41; Reed Deposition; he concedes that violations did in fact occur, and these findings could provide the Defendant with a legitimate, non-discriminatory reason for a decision to terminate Plaintiff's employment.[9]  Near Affidavit, ¶¶ 2 and 4.  The question, therefore, is not whether the Defendant had a justification for the job action taken, but whether the evidence is sufficient to give rise to a genuine issue of fact as to whether Department employees outside of Plaintiff's protected class had engaged in similar type conduct and been treated more favorably under circumstances giving rise to an inference of unlawful discrimination.  After

---

[9]While Defendant characterizes Plaintiff's claim as a "constructive discharge", and Plaintiff did reference a "constructive discharge" in his SCHAC filing, he also claimed that he had been "forced to retire", and he has asserted his claim in this lawsuit as a "termination" claim.  With respect to this argument, the undersigned finds that sufficient evidence has been submitted to give rise to a genuine issue as to whether Plaintiff was in fact terminated by the Defendant to allow his claim to proceed past summary judgment on that basis.  The evidence, considered in the light most favorable to the Plaintiff, shows that Plaintiff did not want to retire unless he would be retiring under the Teri Program, that he had been led to believe that that was going to be the basis for his retirement (i.e., that he would immediately be rehired back and continue serving as the Warden at LCI), but that shortly before his scheduled retirement date he was told that he would not be rehired under the Teri Program.  When Plaintiff balked at this development, the evidence (again, considered in the light most favorable to the Plaintiff) is that Plaintiff was told he could either retire or, if he did not, he would be terminated.  Plaintiff's Deposition (Day 1), p. 126; Plaintiff's Deposition (Day 2), p. 17; see Ward Deposition, pp. 175-176.

10



careful review of the evidence submitted, the undersigned finds and concludes that sufficient evidence has been presented to meet this standard, and to allow Plaintiff's race discrimination claim to survive summary judgment.

Plaintiff notes that he always had a good employment record and good evaluations for over two decades prior to the "shakedown" in question, and that even Ward himself testified that, following the January 2004 shakedown at LCI, Plaintiff continued to effectively perform in his position as Warden at LCI up until the day he left the Defendant's employ. Ward Deposition, pp. 127-128. As evidence of the Defendant's purported discriminatory animus, Plaintiff notes that after his discharge, he was replaced by a white male, Tony Padulla. Bessinger Deposition, p. 43. Plaintiff argues that the Defendant's decision to terminate him, an African-American Warden, in spite of this stellar record, while white wardens did not receive such severe treatment, is also evidence of a discriminatory animus. Plaintiff has identified several white wardens who, he alleges, had problems at their institutions similar to ones found at LCI, but who were not terminated from their employment.

Specifically, Plaintiff testified that in 2004 a shakedown at the Allendale Correctional Institution (ACI) revealed that inmates had access to computers, and that later in 2004 guns were smuggled into that Institution and two inmates were shot, leading to a highly critical SLED report that called for a review of the SCDC's procedures. The white Warden at ACI, George Hagan, received no disciplinary action as a result of these incidents. Plaintiff's Deposition (Day 1), p. 130; Plaintiff's Deposition (Day 2), p. 45; see also Bessinger Deposition, p. 37; Ward Deposition, pp. 186-188. At the Tyger River Correctional Institution (TRCI), inmates were discovered to be using scrap materials to build a hideaway and recreation place where they could assemble without

11



supervision, an incident that received press attention.  The white Warden at TRCI, Rick Smith, received no disciplinary action, and in fact was later allowed to participate in the Teri Program. <u>Plaintiff's Deposition (Day 1)</u>, pp. 122-123; <u>Bessinger Deposition</u>, pp. 37-38; <u>Ward Deposition</u>, pp. 189-191; <u>Defendants' Response to Plaintiff's Request for Production</u>, No. 1.  Both Plaintiff and Bessinger also testified that numerous serious incidents occurred at the McCormick Correctional Institution (McCI), where white Warden Colie Rushton presided, with no corrective actions ever being taken.  <u>Plaintiff's Deposition (Day 1)</u>, pp. 131-132; <u>Bessinger Deposition</u>, pp. 43-44.

At the Kershaw Correctional Institution (KCI), white Warden Oscar Faulkenberry threatened witnesses in a grievance proceeding who were there to testify for an employee whose firing had been recommended by Faulkenberry.  Faulkenberry received only a Level 5 punishment from Ward for this conduct.  <u>Ward Deposition</u>, pp. 194-195; <u>Faulkenberry Deposition</u>, pp. 140-142; <u>Ward Deposition</u>, pp. 59-61.[10]  At the Lieber Correctional Institution (LCI), a murder took place in a lock-up in 2003, but white Warden Stan Burtt was not punished and was thereafter allowed to participate in the Teri Program.  <u>Bessinger Deposition</u>, p. 38; <u>Ward Deposition</u>, pp. 192-193; <u>Defendants' Response to Plaintiff's Request for Production</u>, No. 1.  Finally, two inmates escaped from the Ridgeland Correctional Institution (RCI), were captured, and then escaped again. The white Warden at RCI, Doug Taylor, was allowed to participate in the Teri Program.  <u>Bessinger Deposition</u>, pp. 38-39; <u>Ward Deposition</u>, pp. 193-194; <u>see</u> <u>Defendants' Response to Plaintiff's Request for Production</u>, No. 1.

Defendant argues that these other wardens' conduct was not similar to that of the

---

[10]This deposition testimony was given by Ward in the case of <u>Sainyo v. South Carolina Department of Corrections</u>, C/A No. 3:05-876.



Plaintiff because the charges were not exactly the same.  *Cf.* Ruth v. Children's Medical Center, No. 90-4069, 1991 WL 151158 (6th Cir. August 8, 1991) ["In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of different treatment in a Title VII case, the Plaintiff must prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of the...employees who he alleges were treated more favorably.  This similarity between the compared employees must exist in all relevant [emphasis added] aspects of their respective employment circumstances."]; Hollins v. Atlantic Co., 188 F.3d 652, 659 (6th Cir. 1994).  However, while many of these incidents are not exactly the same as those that occurred at LCI under the Plaintiff, exact sameness is not what is required.  See Harrison v. Metropolitan Gov't of Nashville and Davidson County, 80 F.3d 1107, 1115 (6th Cir. 1996) ["The Supreme Court has noted that in comparing employment discipline decisions, 'precise equivalence in culpability between employees' is not required.  Rather, the Plaintiff must simply show that the employees were engaged in misconduct of 'comparable seriousness.'"] [citations omitted], cert. denied, 519 U.S. 863 (1996), overruled in part on other grounds by, Jackson v. Quanex Corp., 191 F.3d 647, 667 (6th Cir. 1999); see also Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) ["This finding [that although conduct which had been engaged in was not identical, it was nevertheless of 'comparable seriousness'] commendably reflects an understanding both of the need to compare only discipline imposed for like offenses in sorting out claims of disparate discipline under Title VII and of the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances."].

        To be deemed similarly situated, the individual with whom Plaintiff seeks to compare his treatment must deal with the same decisionmaker, have been subject to the same standards, and

13



have engaged in the same type of conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. <u>Mitchell v. Toledo Hospital</u>, 964 F.2d 577, 583 (6th Cir. 1992).  Here, it is apparent that many of the incidents occurring at the white wardens' institutions involved prisoners being in possession of and using contraband items, or moving about unsupervised and in unauthorized areas, deficiencies similar to those found at LCI, while the incident with Faulkenberry, like the incident with the Plaintiff and alleged falsification of documents, involved a warden being directly accused of improper conduct.  Indeed, many of the incidents set out in the evidence, such as inmates being shot, murdered, and escaping, are arguably *more serious* than the incidents involving the Plaintiff.  Further, the evidence reflects that disciplinary decisions with respect to these incidents, except for decisions involving Collie Rushton at MCI, were made by Ward.  <u>See</u> <u>generally</u>, <u>Ward Deposition</u>, pp. 188-195. <u>See Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-618 (7th Cir. 2000) [holding that Plaintiff must demonstrate that the same supervisor was involved in comparable situations to demonstrate disparate treatment of similarly situated employees]; <u>Heyward v. Monroe</u>, No. 97-2430, 1998 WL 841494, **2 (4th Cir. Dec. 7, 1998) [employees similarly situated only if they "dealt with the same supervisor...."].

  While, in the violent world of today's prison environment, instances of misconduct by prison inmates are regrettably prone to occur, the issue here is whether there is evidence to show that the Plaintiff received a more serious punishment for deficiencies found at his prison than did white wardens at other prisons within the SCDC system. The cited evidence is sufficient to create a question of fact as to whether "relevant aspects" of the employment situations at issue were nearly identical, and whether the employees involved engaged in conduct of comparable seriousness with



different levels of discipline being imposed, to establish Plaintiff's prima facie case. In Re Carnegie, 129 F.3d 290, 297 (3d Cir. 1997)[Plaintiff must show that Defendant treated him differently from non-protected employees]; *Cf.* Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997)["The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Exact correlation is neither likely nor necessary, but the cases must be fair congeners."] (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989))[citations omitted].

This evidence is also sufficient to give rise to a genuine issue of fact with respect to pretext to survive summary judgment. To make a demonstration of pretext, Plaintiff must show that "but for" his employer's intent to discriminate against him because of his race, he would not have suffered the adverse employment action. EEOC, 955 F.2d at 941; Conkwright, 933 F.2d at 234. "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole . . . must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [race animus].'" LeBlanc v. Great American Insurance Co., 6 F.3d 836, 843 (1st Cir. 1993)(citing Goldman v. First Nat'l Bank, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting Connell v. Bank of Boston, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991), cert. denied, 111 S.Ct. 2828 (1991)); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141-143 (2000). The evidence, considered in the light most favorable to the Plaintiff, shows that of the three African-American wardens at Level Three institutions when Ward became Deputy Director, two (Plaintiff and Rickie Harrison) were forced out by Ward. Plaintiff was replaced by a white warden, and while it is not clear who immediately replaced Harrison as the Warden at KCI, the current Warden is white. See Plaintiff's Exhibit 15.. The evidence further shows that Plaintiff had worked for the Department of Corrections

15



for well over two decades with an excellent employment record, including both before and after the shakedown at LCI in January 2004, but that Ward nevertheless chose to force Plaintiff's permanent dismissal from the Defendant's employ and not allow him to return to work under the Teri Program, purportedly as a result of the investigative findings following the January 2004 shakedown at LCI, even though white prison wardens who had had similar, or even more serious, problems at their institutions were not as severely disciplined or treated. In addition to this evidence, the material before the Court further shows that only the Plaintiff and Harrison were ever subjected to a shakedown at their institutions without prior notification, even though such prior notifications were routine.

While this evidence is obviously not conclusive on the issue of whether Plaintiff was discriminated against because of his race, and indeed the Defendant has presented significant evidence and testimony to support its decision in this case, the undersigned does not find that, considered in the light most favorable to the Plaintiff, "[n]o reasonable trier of fact could conclude" that Plaintiff suffered the severe disciplinary action he did because of his race based on this evidence. Spratley v. Hampton City Fire Dept., 933 F.Supp. 535, 542 (E.D.Va. 1996), aff'd, 125 F.3d 848 (4th Cir. 1997); see Conkwright, 933 F.2d at 234 ["[I]ndirect evidence of discriminatory motive may do [as long as it is] sufficient for a reasonable factfinder to infer that the employer's decision...was motivated by [race animus]"]; Reeves, 120 S.Ct. at 2105-2109 [setting forth the general proposition that where a plaintiff presents a prima facie case together with sufficient evidence to conclude that the employer's asserted justification for the employment decision is false, a trier of fact can conclude that the employer unlawfully discriminated]; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) [at summary judgment, the "evidence of the non-movant is

16



to be believed, and all justifiable inferences are to be drawn in his favor"]; <u>see</u> <u>also</u> <u>Muhammad v.</u> <u>Klotz</u>, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is the need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'"] citing <u>Anderson</u>, 477 U.S. at 250-252.  Therefore, the Defendant SCDC's  motion for summary judgment with regard to Plaintiff's race discrimination claim under Title VII should be denied.

## II.

### (Retaliation Claim)

In his second cause of action, Plaintiff alleges that after he opposed the Defendant SCDC's racially discriminatory policies, he was retaliated against, treated unfairly and unprofessionally, and "forced out".  Defendant argues that Plaintiff did not assert a retaliation claim in his SCHAC complaint; rather, he only asserted a race discrimination claim, and that Plaintiff's Title VII retaliation claim is therefore barred from consideration by this Court and should be dismissed. The undersigned is constrained to agree.

In order to bring a lawsuit in United States District Court under Title VII, a plaintiff is first required to properly exhaust his or her administrative remedies.  Specifically, Title VII requires that a claimant file a charge of discrimination with the EEOC within one hundred and eighty (180) days of the alleged discriminatory act or acts, or, if the alleged discrimination occurred in a "deferral state", within three  hundred (300) days from the alleged discriminatory act or acts if the claimant initially institutes proceedings with the appropriate state agency, or within thirty (30) days of the state agency's termination of its proceedings, whichever is earlier.  <u>See</u> 42 U.S.C. §



2000e-5(e). It is undisputed that South Carolina is a deferral state, and that SCHAC is the appropriate state agency for purposes of initiating state proceedings. Plaintiff initiated his complaint by filing an administrative charge with SCHAC on August 30, 2004. <u>Plaintiff's Deposition, Defendants' Exhibit 2</u>.

A plain reading of Plaintiff's administrative charge shows that he only asserted a race discrimination claim therein, and did not assert a claim for unlawful retaliation based on his having engaged in protected conduct. The record reflects that Plaintiff's administrative charge alleged that he had been discriminated against on the basis of his race when he was not allowed to retire and continue working under the Teri Program, and that he was forced to retire while white wardens were not, even though they had engaged in more serious conduct. <u>Id</u>. Therefore, Plaintiff's retaliation claim was not presented to SCHAC for review or investigation, and a failure by a plaintiff to properly exhaust his administrative remedies with respect to a discrimination claim bars him from pursuing a Title VII lawsuit on those claims in this Court. <u>United Black Firefighters of Norfolk v. Hirst</u>, 604 F.2d 844, 847 (4th Cir. 1979); <u>Mickel v. South Carolina State Employment Serv.</u>, 377 F.2d 239, 242 (4th Cir. 1967).

In his brief opposing summary judgment, Plaintiff does not respond to the Defendant's argument that he failed to exhaust his administrative remedies with respect to his Title VII retaliation claim, nor does he set forth any basis for the maintenance of such a claim in this lawsuit. Therefore, the undersigned finds and concludes that Plaintiff's retaliation claim is not properly before this Court for consideration, and that this claim should be dismissed. <u>Marshall v. Federal Exp. Corp.</u>, 130 F.3d 1095, 1098 (D.C.Cir. 1997) ["[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's



investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to timely file the EEOC charge."] (quoting <u>Schnellbaecher v. Baskin Clothing Co.</u>, 887 F.2d 124, 127 (7th Cir. 1989)); <u>Smith v. First Union National Bank</u>, 202 F.3d at 247 [EEOC charge "defines the scope of [a plaintiff's] subsequent right to institute a civil suit"]; <u>Sloop v. Memorial Mission Hosp., Inc.</u>, 198 F.3d 147, 148 (4th Cir. 1999) [a Title VII claimant must first exhaust administrative remedies with regard to their claim before filing the claim in federal court]; <u>Chacko v. Patuxent Institution</u>, 429 F.3d 505, 509 (4th Cir. 2005); *cf.* <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 963 (4th Cir. 1996) [ "permitting a late amendment to an original discrimination charge adding an entirely new theory of recovery 'would eviscerate the administrative charge filing requirement altogether' by depriving the employer of adequate notice and resulting in a failure to investigate by the responsible agency."] (quoting <u>Conroy v. Boston Edison Co.</u>, 758 F.Supp. 54, 59-60 (D.Mass. 1991); <u>Lattimore v. Polaroid Corp.</u>, 99 F.3d 456, 464-465 (1st Cir. 1996); <u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002) [when plaintiff changed theory of his case at summary judgment from a termination claim to a failure to transfer claim, court found that plaintiff was bound by the charges he filed with the EEOC, which only mentioned his discriminatory termination claim, and that plaintiff's failure to transfer claim was therefore not properly before the court].

### III.

### (State Law Civil Conspiracy Claim)

Plaintiff's third and final cause of action is asserted against the individual Defendants Robert Ward and Charles Sheppard. Specifically, Plaintiff alleges that these two Defendants engaged in a civil conspiracy to force his resignation in violation of state law, and in so doing acted



maliciously and deliberately with intent to cause the Plaintiff harm.

Defendants Ward and Sheppard assert several defenses to this claim, including the "Intracorporate Conspiracy Doctrine" as well as that Plaintiff was an "at-will" employee who is not entitled to pursue a conspiracy claim. See generally, Oksanen v. Page Memorial Hospital, 945 F.2d 696, 699 (4th Cir. 1991); Buschi v. Kirven, 775 F.2d 1240, 1251-1254 (4th Cir. 1985); Roten v. Galen of West Virginia, No. 97-2178, 1998 WL 325949 (4th Cir. June 18, 1998); Lawson v. South Carolina Department of Corrections, 532 S.E.2d 259, 261-262 (2000). While Plaintiff argues that these two Defendants are not entitled to these defenses, the undersigned finds that, even if this claim is considered on the merits, it is subject to dismissal for the reasons set forth hereinbelow.

"A civil conspiracy consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, and (3) which causes [Plaintiff] special damage." Bivens v. Watkins, 437 S.E.2d 132, 135-136 (S.C.Ct.App. 1993). To satisfy the first element, Plaintiff must show that Ward and Sheppard joined forces. Ryan v. Eli Lilly & Co., 514 F.Supp. 1004, 1012 (D.S.C. 1981) ["This agreement must be shown to exist by and among each defendant and the party who actually committed the wrongful act . . . ."]. Further, if the conspiracy exists, "it is actionable only if overt acts pursuant to the common design proximately cause damage to the party bringing the action." First Union Nat'l Bank of South Carolina v. Soden, 511 S.E.2d 372, 383 (S.C. 1998).

Here, Plaintiff's cause of action for civil conspiracy fails because he has failed to present any evidence to show that Ward and Sheppard had any agreement whatsoever to combine for the purpose of injuring the Plaintiff. While the evidence clearly shows that Sheppard was the Inspector General for the Department during the relevant time period, and that his office conducted



the investigations and inspections at issue, there is no evidence to show that he engaged in any conspiratorial conduct.  As the head of the Office of Inspector General, he would be expected to head-up the investigations of any problems at the prisons, including at LCI.  Plaintiff himself does not dispute that this responsibility fell under Sheppards' purview, nor does he dispute that the investigation at LCI did in fact properly identify problems, abuses, and instances of mismanagement at that Institution.    However, there is no evidence that, following these inspections, Sheppard was involved in the decision not to allow Plaintiff to return to work for the Defendant as part of the Teri Program.  According to the evidence, that decision was made by Ward.  Nor has any evidence been submitted to show that the reason Plaintiff's institution had a shakedown was because of some unlawful conspiracy.  Rather, it is undisputed that the shakedown was ordered as a result of Hair's email, the information in which in fact turned out to be true based on the results and findings of that shakedown.

In sum, while the results of Sheppard's investigations may have provided Ward with the information he used to make the employment decisions at issue in this case with respect to the Plaintiff, there is no evidence that Sheppard played any role in Ward's employment decisions, nor is there any evidence of a civil conspiracy between Sheppard and Ward to harm the Plaintiff or get him terminated from his job. Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) [A Plaintiff may not "create a genuine issue of fact through mere speculation or the building of one inference upon another."]; see also Lawson, 532 S.E.2d at 261-262 [no civil conspiracy where two supervisors discussed whether to terminate an employee].  Therefore, this claim should be dismissed.

## Conclusion

Based on the foregoing, it is recommended that the Defendant SCDC's motion for

21



summary judgment with respect to Plaintiff's first cause of action for race discrimination be **denied**.

It is further recommended that the Defendant SCDC's motion for summary judgment with respect

to Plaintiff's second cause of action for retaliation, as well as the Defendants Sheppard and Ward's

motion for summary judgment with respect to Plaintiff's third cause of action for civil conspiracy,

be **granted**.  If the Court adopts these recommendations, Sheppard and Ward should be dismissed

as party Defendants <u>in</u> <u>toto</u>.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

February 2, 2007

22

